*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* PARRACK/RHOADES/SMITH, Minors.

UNPUBLISHED
June 10, 2025
10:59 AM

Nos. 373422; 373423
Kalamazoo Circuit Court
Family Division
LC No. 2021-000175-NA

Before: MARIANI, P.J., and MALDONADO and YOUNG, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondents appeal by right the order terminating respondent-mother's parental rights to the minor children PP, VR, IS, and MS[2] pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent), and terminating respondent-father's parental rights to VR, IS, and MS pursuant to MCL 712A.19b(3)(a)(*ii*) (child deserted for 91 days or more).[3] We affirm.

---

[1] Respondent-mother appeals by right in Docket No. 373422, and respondent-father appeals by right in Docket No. 373423; this Court consolidated respondents' appeals "to advance the efficient administration of the appellate process." *In re Parrack/Rhoades/Smith Minors*; *In re Rhoades/Smith Minors*, unpublished order of the Court of Appeals, entered December 2, 2024 (Docket Nos. 373422; 373423).

[2] Respondent-mother's eldest child, SR, who was 15 years old at the time of termination, was also involved in these proceedings, but as discussed more thoroughly *infra*, the trial court did not proceed with termination of respondent-mother's parental rights to SR after concluding that it was not in his best interests to do so.

[3] The order also terminated the parental rights of all putative fathers to PP, none of whom are involved in this appeal.

## I. BACKGROUND

In August 2021, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court take jurisdiction over the children and remove them from respondents' care. DHHS alleged neglect by respondent-mother toward her children, particularly focusing on her infant child, MS, who was malnourished and required surgery for hypertrophic pyloric stenosis.[4] DHHS alleged that respondent-mother failed to schedule follow-up medical appointments for MS, which prompted the hospital to contact DHHS. Respondent-mother's two oldest children, SR and PP, lived intermittently with their maternal grandparents throughout their lives, while the three younger children, VR, IS, and MS, were also often left with the grandparents.[5] Concerns were raised about respondent-mother's housing situation, as she appeared to be living in a trailer without electricity and faced eviction; respondent-father was found living in similar conditions. There were also concerns about substance-abuse and mental-health issues, as well as domestic violence between respondents. Following a preliminary hearing, the trial court authorized the petition, removed the children from respondents' care and placed them with their maternal grandparents, and granted unsupervised parenting time to respondent-mother and supervised parenting time to respondent-father.

During the adjudication and interim dispositional hearings in March 2022, DHHS amended the petition to include allegations of inappropriate housing, which respondent-mother admitted when she pleaded to several allegations in the petition and to the court's exercise of jurisdiction. Pursuant to the court's orders, which adopted the case service plan provided by DHHS, respondent-mother's parenting time was unsupervised, but she was required to complete a psychological evaluation and participate in individual counseling to progress to overnight parenting time. Respondent-father also pleaded to several allegations in the petition and to the court's assumption of jurisdiction. Like respondent-mother, respondent-father admitted that he did not have appropriate housing for the children, and pursuant to his case service plan adopted by the court, he was required to undergo a psychological evaluation and substance-abuse assessment and engage in individual counseling.

Throughout the review and permanency planning hearings, respondent-mother struggled with unstable housing, inconsistent employment, and substance-use issues, including positive drug tests. Due to allegations of methamphetamine and marijuana use in front of the children and a physical altercation with SR, respondent-mother's parenting time was changed from unsupervised to supervised in April 2023.[6] Respondent-mother's parenting time remained supervised

---

[4] Hypertrophic pyloric stenosis "is a narrowing of the opening between the stomach and the small intestines" that "usually leads to forceful vomiting, dehydration, poor nutrition and weight loss." Mayo Clinic, *Pyloric Stenosis* <https://www.mayoclinic.org/diseases-conditions/pyloric-stenosis/symptoms-causes/syc-20351416> (accessed May 14, 2025).

[5] The record indicates that, at the time of removal, SR and PP lived more frequently with their maternal grandparents, whereas VR, IS, and MS lived more frequently with respondent-mother.

[6] Respondent-mother's physical altercation with SR also set off a chain of events that resulted in a change in the children's placement. At the time of the altercation, the children were still placed

throughout the rest of the proceedings. Respondent-father was largely uninvolved throughout the proceedings, failing to participate in services or maintain contact with his children. In November 2023, DHHS—at the trial court's direction—filed a supplemental petition requesting termination of respondents' parental rights. Following a four-day termination hearing,[7] the trial court found that clear and convincing evidence established grounds for termination of respondents' parental rights and that a preponderance of the evidence established that termination was in the children's best interests. The trial court thereafter issued an order terminating respondents' parental rights as previously described. These appeals followed.

## II. STANDARDS OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review for clear error a trial court's finding that a statutory ground for termination of parental rights has been proven by clear and convincing evidence and that termination is in a child's best interests. *In re Simpson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368248); slip op at 3. A finding is clearly erroneous if, even if some evidence supports the finding, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id*. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We give deference "to the special ability of the trial court to judge the credibility of witnesses." *In re Pederson*, 331 Mich App 445, 472; 951 NW2d 704 (2020) (quotation marks and citation omitted).

## III. DISCUSSION

On appeal, both respondents challenge the trial court's findings regarding the cited statutory grounds for termination of their parental rights. Respondent-mother also challenges the trial court's finding that termination was in the children's best interests.

## A. STATUTORY GROUNDS FOR TERMINATION

---

with their maternal grandparents, and the altercation occurred at the grandparents' house. The children's grandmother attempted to intervene and respondent-mother punched her in the face multiple times, leaving her with two black eyes. This incident resulted in a substantiated maltreatment-in-care investigation, which subsequently rendered the grandparents' home inappropriate for continued placement. The children were thereafter provided new placements; the three youngest children, VR, IS, and MS, were placed into a licensed foster home together, and PP was placed in a separate foster home in which he could receive the proper treatment and care required to address his specialized needs. SR was placed in a treatment facility so that he could receive appropriate treatment for his behavioral and mental-health issues.

[7] The termination hearing began in April 2024 and concluded in October 2024.

Regarding respondent-mother, the trial court terminated her parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g) and (j). Respondent-mother argues on appeal that the trial court clearly erred by finding that clear and convincing evidence supported termination of her parental rights under these provisions. We disagree.

A court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) if it finds by clear and convincing evidence that "after 182 days have elapsed, the conditions resulting in adjudication remain present and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 4 (quotation marks and citation omitted). What constitutes a "reasonable time" requires consideration of how long the parent will take to improve the conditions and how long the child can wait for the improvements to occur. See *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). "Even if conditions improved in the months before the termination hearing, a trial court may look to the totality of the evidence to determine whether a parent accomplished meaningful change in the conditions that led to adjudication." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022).

In this case, there is no question that more than 182 days elapsed between the issuance of the initial dispositional order in April 2022 and the issuance of the termination order in October 2024. The condition that led to adjudication was respondent-mother's inappropriate housing. Based on the totality of the evidence before the trial court at the time of termination, we see no reversible error in the court's conclusion that this condition continued to exist and that there was no reasonable likelihood that the condition would be rectified within a reasonable time considering the children's ages.

The record evidence supported the trial court's finding that respondent-mother had failed to adequately rectify her housing issues. By the time of the termination hearing, respondent-mother had been living in a house by herself for slightly over a year. She had made considerable improvements to the house during that time, but it still required repairs, decluttering, and adequate food and bedding before it could be deemed suitable for the children. The main concern, however, was that there was no evidence of stability in respondent-mother's housing. Caseworkers testified that, even though housing assistance had been provided, respondent-mother's housing had fluctuated significantly throughout the case, noting that respondent-mother cycled through living with friends, in her car, in shelters, and in a tent or barn on her parents' property. Regarding her housing at the time of termination, respondent-mother could not provide documentation, such as a lease or rental agreement, to show that the housing was stable, and she testified that she only had a verbal agreement with one of the owners that she could live in the house in exchange for making repairs and paying the utilities. Although respondent-mother had lived in the same place for more than a year, as the caseworkers testified, without a written agreement, respondent-mother could lose her housing at any time. Even if the evidence suggested that respondent-mother could complete the repairs and decluttering necessary to obtain DHHS's approval of her housing within a reasonable time, nothing indicated that respondent-mother's housing was secure or that respondent-mother necessarily wanted to (or could) commit to a lease or rental agreement.

The record evidence also supported the trial court's findings that there was no reasonable likelihood that respondent-mother would rectify this condition within a reasonable time considering the children's ages. See MCL 712A.19b(3)(c)(*i*). As previously indicated,

-4-

respondent-mother's housing was unstable throughout much of the 38-month pendency of this case. And although respondent-mother lived in the same house for approximately one year toward the end of the proceedings, her residence there was solely based on a verbal agreement with one of the homeowners, and there was no evidence indicating that respondent-mother could or would obtain a written agreement to ensure its stability. The house was also still deemed unsuitable for the children to live in at the time of the termination hearing, despite the improvements that respondent-mother had made, and there was no evidence indicating that respondent-mother could bring the house to suitable condition anytime soon.

Respondent-mother stresses that "the house was not unstable" and that "any issues with the home were rectified," and it was "unclear where the [trial] court obtained this information." In doing so, however, respondent-mother relies exclusively on her own testimony at the termination hearing and ignores all other testimony to the contrary that was provided by her caseworkers. It is apparent from the record that, given all the evidence presented, the trial court found the caseworkers' testimony on the matter to be more credible than respondent-mother's, and we defer to a trial court's witness-credibility determinations. See *Pederson*, 331 Mich App at 472.

In sum, the totality of the record before the trial court at the time of termination provided a sufficient basis for the court to conclude that, despite any recent improvements respondent-mother may have made in addressing her housing issues, clear and convincing evidence demonstrated that she had not "accomplished meaningful change in the conditions that led to adjudication" and there was no reasonable likelihood that she would rectify those conditions within a reasonable time given the children's ages. *Jackisch/Stamm-Jackisch*, 340 Mich App at 334; MCL 712A.19b(3)(c)(*i*). Respondent-mother has failed to show that the trial court reversibly erred in reaching this conclusion.

The trial court also terminated respondent-mother's parental rights under MCL 712A.19b(3)(c)(*ii*), which is proper if "182 or more days have elapsed since the issuance of an initial dispositional order," and the court finds by clear and convincing evidence that "[o]ther conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions," those "conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." As previously noted, it is undisputed that more than 182 days had elapsed since the issuance of the initial dispositional order. The conditions that arose after respondent-mother's adjudication include substance-abuse, mental-health, and domestic-violence issues. Clear and convincing evidence supported the court's finding that respondent-mother failed to make any meaningful progress toward rectifying these conditions.

Respondent-mother acknowledged at the termination hearing that she had a problem with addiction, but she nonetheless failed to participate in or benefit from substance-abuse services offered to her throughout the case. Respondent-mother's parenting time was changed from unsupervised to supervised due to allegations of methamphetamine and marijuana use in the children's presence. Even after the trial court made clear that drug screening was imperative, respondent-mother missed far more drug screens than she attended, and for the few that she

completed, she tested positive for amphetamines and THC.[8]  Respondent-mother indicated throughout the case that she missed drug screens because she lacked transportation, but when the caseworkers offered alternative solutions, such as a caseworker going to her to complete a drug screen or the service provider reimbursing her for an Uber to the screening location, respondent-mother never took advantage of those arrangements.  Respondent-mother acknowledged in January 2024 that missed drug screens were deemed positive, but after testing positive for methamphetamine in March 2024, she stopped participating in drug screens altogether.  She neither provided proof of her abstinence from illegal drugs through drug screens nor demonstrated her efforts to comply with her case service plan and the court's orders to contact her caseworkers if she lacked transportation to a drug screen.

As to mental-health counseling, the record suggests that respondent-mother sought counseling but attended sporadically.  Staffing issues at one facility may have delayed the start of individual counseling there, and respondent-mother indicated that insurance issues may have interrupted counseling at a subsequent facility.  When respondent-mother began counseling again in April 2024, she saw a different counselor at a new facility.  Although respondent-mother was supposed to attend counseling weekly there, she attended 6 of 25 scheduled individual sessions and two group sessions between April 2024 and September 2024.  Caseworkers were unable to ever talk to respondent-mother's counselor about respondent-mother's attendance and progress because she never signed a release allowing them to do so.  At the termination hearing, respondent-mother submitted into evidence a letter from her counselor describing the goals and focuses of her counseling sessions, but the letter also emphasized that her attendance was minimal.

Regarding domestic violence, the evidence indicates that respondent-mother was both a victim and a perpetrator.  Respondent-mother testified that she suffered abuse at the hands of respondent-father and other men in her life, and she eventually obtained a personal protection order against respondent-father during the proceedings.  There was also record evidence that respondent-mother and her eldest son, SR, often engaged in domestic-violence incidents with one another—including, as noted above, an incident that also involved respondent-mother punching the children's grandmother in the face multiple times and giving her two black eyes.  Respondent-mother was referred to various domestic-violence services throughout the case, but she never participated in any of the offered services, and respondent-mother acknowledged as much during her testimony at the termination hearing.

Given the record evidence that respondent-mother did not participate in and show benefit from substance-use services, mental-health counseling, or domestic-violence services offered to her, and deferring to the trial court's credibility assessments, *Pederson*, 331 Mich App at 472, the

---

[8] "Tetrahydrocannabinol, or THC, is the physiologically active component of marijuana." *People v Koon*, 494 Mich 1, 3 n 3; 832 NW2d 724 (2013), citing *Stedman's Medical Dictionary* (26th ed), p 1791.

trial court did not clearly err by finding grounds to terminate her parental rights under MCL 712A.19b(3)(c)(*ii*).[9]

Regarding respondent-father, the trial court terminated his parental rights pursuant to MCL 712A.19b(3)(a)(*ii*), which is appropriate when there is clear and convincing evidence that "[t]he child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period." Respondent-father does not argue that, in light of the evidence before it at the time of termination, the court clearly erred by finding by clear and convincing evidence that he deserted his children for 91 days or more without seeking custody during that period. Nor could he, as the record makes clear that, following adjudication, respondent-father never appeared in court, engaged in parenting time, provided support to the children, participated in his case service plan, or communicated with his caseworker. Rather, respondent-father argues that the outcome would have been different had the court known that his apparent abandonment of the children resulted from respondent-mother's threats. As support, respondent-father attaches to his brief on appeal screenshots of text messages that he asserts prove that respondent-mother threatened to make false allegations against him if he exercised parenting time or attended court hearings.

Respondent-father offers, and we see, no colorable basis for disrupting the trial court's termination decision on the basis of these messages. To start, "[a]ppeals to the Court of Appeals are heard on the original record," MCR 7.210(A), and as respondent-father concedes, these images were never provided to the trial court and are not part of the lower court record as defined in MCR 7.210(A)(1). See *Meisner Law Group PC v Weston Downs Condo Ass'n*, 321 Mich App 702, 724-725; 909 NW2d 890 (2017) (holding that presenting evidence for the first time on appeal constitutes an improper expansion of the record on appeal and that "this Court's review is limited to the trial court record" at the time that the decision was rendered). Respondent-father has not moved this Court to expand the record, nor does he ask this Court on appeal to exercise its discretion to allow an addition to the record under MCR 7.216(A)(4) or to remand the case to the trial court to allow the court to take additional evidence under MCR 7.216(A)(5). Respondent-father also does not provide any explanation as to why he did not present these messages to the trial court or why it would be proper to expand the record on appeal to include them despite his failure to present them below. Nor is it apparent from the messages themselves that they necessarily represent what he claims or that, even if they did, they would have accounted for the full scope of his desertion or otherwise meaningfully undermined the totality of evidence supporting the court's termination decision. Simply put, respondent-father has offered nothing to substantiate the notion that the messages are properly considered on appeal or would provide a viable reason to disturb the trial court's termination of his parental rights under MCL 712A.19b(3)(a)(*ii*). See *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015) (stating that a party "may not merely announce a position and then leave it to this Court to discover and rationalize the basis for [his] claims," nor may he "give an issue only cursory treatment with

---

[9] Given our conclusions regarding these statutory grounds for termination, we need not address respondent's arguments regarding MCL 712A.19b(3)(g) and (j). See *Jackisch/Stamm-Jackisch*, 340 Mich App at 333-334.

little or no citation of authority"); see also *id*. ("[T]his Court will not search for authority to sustain or reject a party's position.") (quotation marks, citation, and alteration omitted).

## B. BEST-INTERESTS DETERMINATION

As noted, respondent-mother also argues that the trial court erred by finding that termination of her parental rights was in the children's best interests. We disagree.

When determining whether termination is in the best interests of the child, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the child's best interests," and it should consider a variety of factors, including "the child's bond to the parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home." *Simpson*, ___ Mich App at ___; slip op at 5 (quotation marks, citations, and alterations omitted). "Other factors that the court may consider include the parent's history, the parent's psychological evaluation, the age of the child, and a parent's substance-abuse history." *MJC*, ___ Mich App at ___; slip op at 10 (citations omitted). The court may also consider "the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child's well-being while in care, and the possibility of adoption," *id*. (quotation marks, citation, and alteration omitted), as well as "how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all," *In re CJM*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367565); slip op at 4 (quotation marks and citation omitted).

Respondent-mother argues that the trial court gave inadequate weight to her parenting skills and the parent-child bond.[10] The record clearly reflects, however, that the trial court duly considered both. Regarding respondent-mother's parenting skills, the court acknowledged that respondent-mother's parenting-time attendance was "good" and that she clearly "love[d] the children," but it found that she "ha[d] such significant deficits as a parent" that the children would not be "safe in [her] care," noting that she prioritized herself over the children, frequently engaged in domestic-violence incidents with SR, and "took advantage of [her parents'] willingness to take all five children at any time that she decided not to be at the home and live her life away from her children." The record reflects that respondent-mother's parenting time was initially unsupervised but was eventually changed to supervised after DHHS received allegations that, during parenting times, respondent-mother used methamphetamine and marijuana in the children's presence, provided marijuana to SR, and left the other four children to be cared for by SR. Respondent-mother also completely disregarded the supervised parenting time schedule provided to her and instead simply showed up whenever, and stayed for as long as, she wanted. Regarding the parent-

---

[10] In support of this argument, respondent-mother heavily relies on the fact that her parental rights to her eldest child, SR, were not terminated. The record makes clear, however, that this had nothing to do with the parent-child bond or respondent-mother's ability to parent. At the start of the termination hearing, DHHS asked that the court not proceed with termination regarding SR because it was not in his best interests given his age, behavioral issues, potential placement at a treatment facility to address his mental-health and behavioral issues, and unlikelihood of adoption.

child bond, the court surmised that the children each lacked a strong bond with respondent-mother because they had been in their grandparents' care for most of their lives. Respondent-mother testified that she loved her children and they loved her, but multiple caseworkers and the children's grandmother testified that all the children were very closely bonded to the grandparents. One caseworker testified that SR and PP were so attached to their grandparents that they wanted to return to their grandparents' home, and the children's grandmother testified that the children saw her and her husband as parental figures. The court expressly stated that it did not find respondent-mother's testimony regarding her parents' involvement in—and impact on—her children's lives to be credible, particularly in light of the other testimony presented. See *Pederson*, 331 Mich App at 472.

Furthermore, even if respondent-mother had demonstrated adequate parenting skills or that a strong parent-child bond existed between her and the children, these are just two of many considerations potentially relevant to a best-interests determination. See *Simpson*, ___ Mich App at ___; slip op at 5. The trial court also considered—and the record supported—several other factors relevant to its best-interests determination, including respondent-mother's noncompliance with her case service plan; the children's former relative placement;[11] the children's well-being in care; and the children's need for permanency, stability, and finality. As previously discussed, record evidence supported the court's conclusion that respondent-mother had not accomplished meaningful change in the condition that led to adjudication, i.e., inappropriate and unstable housing. See *MJC*, ___ Mich App at ___; slip op at 10; *Jackisch/Stamm-Jackisch*, 340 Mich App at 334. There was also significant evidence that respondent-mother did not fully participate in and benefit from her case service plan, and that mental health, substance abuse, and domestic violence all remained substantial issues at the time of termination. See *MJC*, ___ Mich App at ___; slip op at 10 (citations omitted). Testimony also established that SR and PP had lived primarily with their grandparents for most of their lives, and although the three youngest children occasionally lived with respondent-mother in temporary accommodations, they often lived with their grandparents while respondent-mother searched for other housing. And as to the children's well-being in care, the court noted that the youngest three children were doing well in their placement and that, after respondent-mother's protracted refusal to allow PP to receive proper treatment for his behavioral and mental-health needs, PP was finally in a placement where he received the medication and treatment that he needed.[12]

In sum, the record reflects that the trial court properly weighed all the evidence available to it at the time that it made its best-interests determination, *Simpson*, ___ Mich App at ___; slip op at 5, and we see no clear error in its findings, *id*. at ___; slip op at 3.

---

[11] At the termination hearing, the trial court expressly and duly considered on the record the children's prior relative placement with their maternal grandparents and the lack of other possible relative placements. See *CJM*, ___ Mich App at ___; slip op at 4, 6.

[12] Similarly, although respondent-mother's parental rights to SR were not at risk, the court observed that SR was also finally in a placement where his behavioral and mental-health needs were being addressed.

Affirmed.

/s/ Philip P. Mariani
/s/ Allie Greenleaf Maldonado
/s/ Adrienne N. Young